United States District Court
Southern District of Texas

**ENTERED**

February 15, 2017

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHUNEKA E. WHITAKER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-15-2204 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] are Defendant's Cross-Motion for Summary Judgment (Doc. 9) and Plaintiff's Motion for Summary Judgment (Doc. 24). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's motion be **GRANTED** and Plaintiff's motion be **DENIED**.

### I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claims for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act ("the Act").

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 21, Ord. Dated August 4, 2016.

A. __Medical History__

Plaintiff was born on February 18, 1978, and was thirty-five years old on the alleged disability onset date of March 20, 2013.[2] Based on her earnings record, Plaintiff remained insured through December 31, 2015.[3] Plaintiff achieved a high school education and training as a medical assistant.[4] Plaintiff's prior work included aircraft maintenance driver, security guard, telemarketer, and package scanner.[5] Plaintiff stopped working on March 20, 2013,[6] due to her conditions.[7]

In 2011, prior to the alleged onset of disability, Plaintiff began treatment for headaches, left-sided numbness, left-eye blurry vision, eye rotation, and vocal cord paralysis and was diagnosed with Chiari malformation.[8] She underwent corrective surgery in October of that same year.[9]

Beginning in March 2012, Plaintiff received treatment for

---

[2]    See Tr. of the Admin. Proceedings ("Tr.") 251, 253, 278.

[3]    See Tr. 278.

[4]    See Tr. 282.

[5]    See Tr. 282, 304, 325.

[6]    As Plaintiff filed applications for benefits prior to March 20, 2013, it seems highly unlikely that this date is when Plaintiff last worked.

[7]    See Tr. 281.

[8]    See Tr. 107-109, 369, 371, 372, 448.  "Chiari malformations are a group of complex brain abnormalities that affect the area in lower posterior skull where the brain and spinal cord connect."  Chiari Malformations, WebMD (March 5, 2014), www.webmd.com/migraines-headaches/arnold-chiari-malformation-10486.

[9]    See Tr. 108, 448.

depression at Mental Health Mental Retardation Authority of Harris County ("MHMRA").[10]   At MHMRA, Roberto Flores, M.D., ("Dr. Flores") followed Plaintiff for medication management, and Plaintiff received counseling.[11]   When Plaintiff completed an inventory of depressive symptomatology in March 2012, she reported that she: (1) struggled to focus her attention or to make decisions most of the time; (2) thought almost constantly about major and minor defects in herself; (3) thought about suicide or death several times a week for several minutes; (4) felt virtually no interest in formerly pursued activities; (5) could not carry out most of her usual daily activities because she did not have the energy; (6) took several seconds to respond to most questions and felt like her thinking was slowed; and (7) was often fidgety, wringing her hands or needing to shift how she was sitting.[12]   All but the last of these personal ratings fell in the lower functioning half of the symptomatology inventory.[13]

On January 10, 2013, ten months after Plaintiff began treatment at MHMRA and two months prior to the alleged onset date, Dr. Flores saw Plaintiff for medication maintenance and recorded that she reported sleeping better and denied crying spells,

---

[10]   See Tr. 452-547, 554-571, 653-719.  MHMRA is now known as The Harris Center for Mental Health and IDD (Intellectual and Development Disabilities).

[11]   See id.

[12]   See Tr. 493-94.

[13]   See id.

suicidal or homicidal ideation, audio or visual hallucinations, and delusions.[14]  He noted that she was neatly groomed, exhibited motor retardation, exhibited goal-directed associations, and was alert.[15] Dr. Flores described Plaintiff's mood as dysthymic.[16]  Plaintiff's attention span and concentration were good, as were her insight and judgment.[17]

On January 12, 2013, Plaintiff presented to St. Luke's Episcopal Hospital ("St. Luke's") emergency room with left upper extremity cellulitis and was admitted to the hospital for seventeen days.[18]  Plaintiff also suffered from anemia and tachycardia.[19] Plaintiff underwent various tests and studies.[20]  The attending physician consulted specialists in the areas of rheumatology, hematology, and cardiology.[21]  Mark Udden, M.D., ("Dr. Udden") was the hematology specialist consulted.[22]

The attending physician diagnosed Plaintiff with acute internal jugular vein thrombosis, a rare vascular disease, and

---

[14]    See Tr. 694, 695.

[15]    See Tr. 695.

[16]    See id.

[17]    See id.

[18]    See Tr. 586.

[19]    See id.

[20]    See Tr. 369, 586.

[21]    See Tr. 586.

[22]    See Tr. 372, 586.

upper extremity cellulitis, a common infection of the skin.[23] Plaintiff was instructed to follow up with St. Luke's outpatient hematology clinic.[24]

On February 17, 2013, St. Luke's again admitted Plaintiff through its emergency room on her report of left-sided arm weakness and numbness and worsening headache and fever.[25] She was also experiencing tachycardia.[26] The medical providers initiated the protocol for pulmonary embolism but found no evidence of a pulmonary embolism or any other new abnormalities.[27] A cardiologist was consulted with no resultant diagnosis.[28] During the hospitalization, Plaintiff was examined by Dr. Udden, whom she was instructed to see on an outpatient basis after discharge.[29] On discharge, the attending physician listed no new diagnoses but recorded a suspicion for adult-onset Still's disease.[30]

On February 28, 2013, Plaintiff returned to St. Luke's for an

---

[23]     See Tr. 586.

[24]     See id.

[25]     See Tr. 580.

[26]     See id.

[27]     See id.

[28]     See id.

[29]     See id.

[30]     See id. (listing Chiari malformation, mediastinal lymph node enlargement of unknown origin, and history of deep venous thrombosis including left suclavian and left internal jugular vein). "Adult-onset Still's disease is an inflammatory disease that may affect many joints, internal organs, and other parts of the body." Adult-Onset Still's Disease, WebMD (Sept. 16, 2016), www.webmd.com/arthritis/adult-onset-stills-disease#1.

outpatient appointment in the hematology clinic with Dr. Udden.[31] In his note, he recounted Plaintiff's extensive work up for fever and lymphadenopathy (swelling of the lymph nodes) during the January hospitalization.[32]  In the review of symptoms, Dr. Udden found Plaintiff positive for neck stiffness, negative for visual disturbance, negative for shortness of breath, positive for palpitations, negative for chest pain and leg swelling, positive for weakness, positive for headaches, negative for adenopathy, negative for bruising or bleeding, and positive for dysphoric mood.[33]  The physical examination was normal except for torticollis,[34] enlargement spasm of the left strap muscles, slight swelling of the left arm, and slight weakness in left arm and leg.[35] Dr. Udden noted that Plaintiff was alert and oriented to person, place, and time with normal mood, affect, and thought content.[36]

Plaintiff medications at the time were: (1) Abilify (generically known as Aripiprazole) for depression; (2) Cymbalta (generically known as Duloxetine) for depression; (3) Coumadin

---

[31]    See Tr. 372-75.

[32]    See Tr. 372.

[33]    See Tr. 373.

[34]    "Cervical dystonia, also known as spasmodic torticollis, is a rare neurological disorder characterized by involuntary muscle contractions in the neck that cause abnormal movements and postures of the neck and head." Cervical Dystonia, WebMD (Feb. 4, 2013), www.webmd.com/brain/spasmodic-torticollis-11089.

[35]    See Tr. 374.

[36]    See id.

6

(commonly known as brand name Warfarin) for blood clots; (4) Lovenox (generically known as Enoxaparin Sodium) for blood clots; (5) Cyclobenzaprine (commonly known as brand name Flexeril) for muscle spasms; (6) Methocarbamol (commonly known as brand name Robaxin) for muscle spasms and pain; (7) Gabapentin (commonly known as brand name Horizant) for nerve pain; (8) Norco (generically known as Hydrocodone Bitartrate/Acetaminophen) for pain; (9) Tramadol (commonly known as brand name Ultram) for pain; and (10) Doxepin (commonly known as brand name Silenor) for insomnia.

Dr. Udden's impression was that Plaintiff's headaches were possibly secondary to Chiari malformation or to strain caused by left shoulder enlarged muscle, that the swelling was secondary to previous clots and left-shoulder muscle enlargement, that Plaintiff suffered from adult-onset Still's disease, and that the lymphadenopathy was stable.[37]   He also indicated that the torticollis may be related to Chiari malformation.[38]

In a medication maintenance note dated March 7, 2013, Dr. Flores recorded that Plaintiff reported feeling "SOME DEPRESSED MOOD" but was sleeping well and denied crying spells, suicidal or homicidal ideation, audio or visual hallucinations, and delusions.[39] He noted that she was neatly groomed, had a normal gait and

---

[37]   See Tr. 375.

[38]   See id.

[39]   See Tr. 688, 689.

station, was cooperative, exhibited normal motor activity, and spoke at a normal rate and rhythm with spontaneous language.[40] Dr. Flores described Plaintiff's mood as dysthymic.[41]

On March 11, 2013, Plaintiff was again admitted to St. Luke's with complaints of suprapubic abdominal pain.[42]   The medical providers detected a hematoma in the psoas muscle in the lower back and an ovarian cyst and discontinued the anticoagulation medication.[43]   The attending physician discharged Plaintiff to follow up with St. Luke's outpatient hematology clinic.[44]

On March 19, 2013, Plaintiff went to St. Luke's outpatient hematology clinic as instructed.[45] She saw Kevin Patel, M.D., ("Dr. Patel"), who was under the tutelage of Dr. Udden, for blood tests and continuing treatment.[46]   By Plaintiff's own report, she was feeling well except for chronic headaches and muscle spasms in the left side of her neck.[47]  Dr. Patel's review of systems and physical examination produced the same results as noted by Dr. Udden at the prior appointment, including the presence of neck stiffness, no

---

[40]     See Tr. 689.

[41]     See id.

[42]     See Tr. 574.

[43]     See Tr. 574, 384.

[44]     See Tr. 574.

[45]     See Tr. 379-83.

[46]     See Tr. 379-83.

[47]     See Tr. 382.

visual disturbance, and slight weakness in left arm and leg.[48]  Dr. Patel noted that Plaintiff was alert and oriented to person, place, and time with normal mood, affect, and thought content.[49]  On review of blood tests, Dr. Patel found evidence of anemia.[50]  Plaintiff's medications were the same as at her last clinic visit except Coumadin and Lovenox had been discontinued and replaced by Xarelto (generically known as Rivaroxaban) during Plaintiff's March hospitalization.  Dr. Patel's impression was also the same as Dr. Udden's prior notes with the addition of ovarian hemorrhagic cyst.[51]  Dr. Udden suggested that the chronic headaches may be due to Chiari malformation and caused by neck spasm torticollis.[52]

On May 28, 2013, Dr. Udden examined Plaintiff, ordered blood tests, and recorded identical information for the review of systems, including neck stiffness and no visual disturbance, and for the physical examination, including slight weakness in left arm and leg.[53]  Since her last appointment, Plaintiff had seen Doris Kung, M.D., ("Dr. Kung") for an initial work up and treatment for headaches and torticollis and a gynecologist for study and

---

[48]     See Tr. 380.

[49]     See Tr. 381.

[50]     See Tr. 381, 383.

[51]     See Tr. 382.

[52]     See Tr. 383.

[53]     See Tr. 392-95.

treatment of the ovarian lesion, which was found to be benign.[54]

Plaintiff's then current medications included the continuation of Abilify and Cymbalta for depression, Methocarbamol for muscle spasms and pain, Gabapentin and Norco for pain, and Xarelto for blood clots, as well as the additions of Lioresal (generically known as Baclofen) for muscle spasms, Trazodone (commonly known as brand name Desyrel) for depression, and Imitrex (generically known as Sumatriptan Succinate) for migraine headaches.[55]   Dr. Udden reiterated his prior impressions regarding swelling and adult onset Still's disease but noted that Dr. Kung was treating the headaches, that the lymphadenopathy "appear[ed] to have resolved," and that the anemia "ha[d] largely resolved."[56]

On June 21, 2013, a counselor at MHMRA assessed Plaintiff's depressive symptomatology.[57]   The counselor found that Plaintiff: (1) experienced no change in usual capacity to concentrate and decide; (2) was more self-blaming than usual; (3) did not think of suicide or death; (4) noticed a reduction in former interests and activities; (5) tired more easily than usual; (6) noted slowed thinking with reduced voice modulation; (7) and exhibited no

---

[54]   See Tr. 393.

[55]   See id.

[56]   Tr. 395.

[57]   See Tr. 484-87.

increased speed or disorganization in thinking or gesturing.[58]  All of these ratings placed Plaintiff in the higher functioning half of the assessment scale.[59]

In a medication maintenance note dated July 23, 2013, Dr. Flores indicated that Plaintiff reported doing well and denied crying spells, suicidal or homicidal ideation, audio or visual hallucinations, and delusions.[60]  He noted that she was casually dressed, had a normal gait and station, was cooperative, exhibited normal motor activity, spoke at a normal rate and rhythm with spontaneous language, exhibited logical thought processing and goal-directed associations, and was alert with grossly intact cognition.[61]  Dr. Flores described Plaintiff's mood as euthymic with appropriate affect.[62]  Plaintiff's immediate recall and recent and remote memory were intact, and her attention span and concentration were good.[63]

On October 1, 2013, Plaintiff was seen at the St. Luke's hematology clinic for blood tests and an appointment with Sardar Imam, M.D., ("Dr. Imam"), who was under the tutelage of Dr. Udden.[64]

---

[58]   See Tr. 490-91.

[59]   See id.

[60]   See Tr. 682, 683.

[61]   See Tr. 682-83.

[62]   See Tr. id.

[63]   See Tr. 683.

[64]   See Tr. 400-03.

The review of symptoms and the physical examination rendered the same results as prior appointments.[65]   Plaintiff's medications remained the same except for the addition of Hydrochlorothiazide (commonly known as brand name Hydrodiuril) for hypertension.[66] Other than raising the question whether the symptoms giving rise to the diagnosis of Adult onset Still's disease could have been caused by a viral syndrome, Dr. Imam's impression was consistent with that noted in the prior treatment notes.[67]   Dr. Udden added that Plaintiff was doing well on Xarelto but still experienced pain in the left arm, which he opined was neuropathic.[68]   He also noted that, although he renewed the Norco prescription, he advised Plaintiff to take the prescribed Gabapentin because, in his opinion, "it might help."[69]

On November 5, 2013, a counselor at MHMRA assessed Plaintiff's depressive symptomatology.[70]   The counselor found that Plaintiff: (1) occasionally felt indecisive or noted that attention often wandered; (2) saw herself as equally worthwhile and deserving as others; (3) did not think of suicide or death; (4) noticed a reduction in former interests and activities; (5) tired more easily

---

[65]   See Tr. 401-02.

[66]   See Tr. 401.

[67]   See Tr. 402-03.

[68]   See Tr. 399.

[69]   See Tr. 400.

[70]   See Tr. 484-87.

than usual; (6) exhibited normal speed of thinking, gesturing, and speaking; and (7) exhibited no increased speed or disorganization in thinking or gesturing.[71]  All of these ratings placed Plaintiff in the higher-functioning half of the assessment scale.[72]

On February 4, 2014, Dr. Udden saw Plaintiff for continuing treatment, and the results of Dr. Udden's review of symptoms and physical examination did not differ from prior appointments.[73]  He noted that Plaintiff was seeing a new neurologist for treatment of headaches and torticollis.[74]  Plaintiff's medications remained the same except for the addition of Bactrim (generically known as Sulfamethoxazole-Trimethoprim) for infection.[75]  No changes were made in the impression notes.[76]

On February 17, 2014, first saw Jack Alpert, M.D., ("Dr. Alpert"), a neurologist with UT Physicians.[77]  Plaintiff reported to Dr. Alpert that she began experiencing severe headaches while in her twenties and developed left neck and shoulder pain, blurred vision in her left eye, and impaired balance in 2010.[78]  She

---

[71]  See Tr. 486-87.

[72]  See id.

[73]  See Tr. 404-07.

[74]  See Tr. 404.

[75]  See Tr. 405.

[76]  See Tr. 406-07.

[77]  See Tr. 448.

[78]  See id.

explained that the suboccipital craniectomy performed in 2011 "did not alleviate her symptoms."[79]

Plaintiff described her current headaches as occipital, throbbing headaches with nausea, photophobia, and phonophobia, which she suffered, on average, four times per week for periods of several hours to entire days. According to Plaintiff, she had been treated only with analgesics, such as hydrocodone, which did not alleviate her symptoms.[80] Her other symptoms included difficulty with concentration and memory, numbness, tingling, and a sense of swelling along the entire left side of her body, and difficulty swallowing and hoarseness, the last of which Plaintiff said was due to paralysis of her left vocal cord.[81]

In the review of symptoms, Dr. Alpert recorded recent weight loss and malaise, blurred vision, hoarseness, chest pain, intermittent leg cramps, lower extremity edema, shortness of breath, joint pain, neck pain, joint swelling, leg and arm pain and swelling, confusion, memory loss, decreased concentration, changed thought patterns, repeated questioning about recent events, facial weakness, arm, hand, and leg weakness, poor coordination, numbness, tingling, lightheadedness, migraine headaches, difficulty walking and frequent falling, suicidal ideation, sleep disturbances,

---

[79]   Id.

[80]   See id.

[81]   See id.

14

depression, personality change, emotional problems, muscle weakness, and a tendency for easy bruising.[82]

Dr. Alpert noted the following regarding Plaintiff's mental status:

> [T]he patient is alert, oriented and has normal speech content. She does simple spelling and reversals of five letter words correctly. She is unable to add 14+16 and struggles but correctly adds 14+7. Short-term recall is 0/3 words after 3 minutes have elapsed. On repeat testing she is accurate.[83]

Dr. Alpert observed that Plaintiff had "torsional, clockwise, up beating nystagmus in all directions of gaze" and "retinal nystagmus upward," but visual fields were intact.[84] The doctor found Plaintiff's strength to be normal "other than mild weakness of intrinsic left hand musculature with strength of about 4/5."[85] He also noted mild left finger-to-nose ataxia (impaired ability to control movement), slightly slower rapid finger tapping on the left, "impaired rapid alternating movements of the left arm," and slight turn of the head to the right."[86] Regarding Plaintiff's gait, Dr. Alpert recorded that Plaintiff walks normally with a mildly unsteady tandem gait and she is able to get up on heels and

---

[82]    See Tr. 450.

[83]    Id.

[84]    Id.

[85]    Id.

[86]    Tr. 448-49.

toes well.[87]  The Romberg balance test was negative.[88]

As his impression, Dr. Alpert listed Chiari malformation, status postop of suboccipital craniectomy, with residual dysfunction, common migraine, torticollis, and depression.[89]  He summarized:  "The patient has significant neurologic dysfunction probably involving mainly cerebellar system structures.  It appears unlikely that she will have any improvement with regard to her eye movement abnormalities [nystagmus]."[90]  Dr. Alpert made changes to Plaintiff's medication by increasing the dosage of Gabapentin and adding Propranolol (commonly known as brand name Inderal) for migraine headaches.[91]  He considered an increased dosage of Cymbalta but deferred to Plaintiff's psychiatrist's opinion.[92]  Dr. Alpert sent a letter to Jamir Mireles, M.D., ("Dr. Mireles") regarding the consultation with Plaintiff, describing Plaintiff's symptoms and the results of the neurologic examination.[93]

In a medication maintenance note dated March 7, 2014, Dr. Flores recorded that Plaintiff reported doing "well" and denied crying spells, suicidal or homicidal ideation, audio or visual

---

[87]   See Tr. 449.

[88]   See id.

[89]   See id.

[90]   Id.

[91]   See id.

[92]   See id.

[93]   See Tr. 447.

hallucinations, and delusions.[94]   He noted that she was neatly groomed, had a normal gait and station, was cooperative, exhibited normal motor activity, spoke at a normal rate and rhythm with spontaneous language, exhibited logical thought processing and goal-directed associations, and was alert with grossly intact cognition.[95]  Dr. Flores described Plaintiff's mood as euthymic with appropriate affect.[96]

On March 21, 2014, Plaintiff returned to see Dr. Alpert.[97] Plaintiff reported that the headaches were "a little less severe" with the medication.[98]   The review of systems report listed only poor concentration, forgetfulness, insomnia, restless sleep, and hoarseness.[99]   The doctor reported no current respiratory, cardiovascular, gastrointestinal, genitourinary, dermatologic, or endocrine symptomatology.[100]

On examination, Dr. Alpert recorded that the visual fields were intact, that Plaintiff had rotatory nystagmus in all directions of gaze but no ocular dysmetria.[101]  Plaintiff's motor

---

[94]    See Tr. 567, 568.

[95]    See Tr. 567–68.

[96]    See Tr. 568.

[97]    See Tr. 442.

[98]    See id.

[99]    See id.

[100]    See id.

[101]    See id.

skill deficits noted by the doctor were mild left finger-to-nose ataxia and slower rapid alternating movements in left arm.[102]   He found no focal weakness, normal muscular tone, and no ataxia on heel-to-knee test.[103]   Her gait was normal but slightly unsteady with a slightly wide base.[104]   Regarding Plaintiff's mental status, Dr. Alpert recorded that Plaintiff was alert and oriented with normal speech content and prompt and appropriate responses to questions.[105]   He described her mood as slightly depressed.[106]

Dr. Alpert's impression was that Plaintiff suffered Chiari malformation, status postop of suboccipital craniectomy, syringomyelia with suspected medulla involvement, migraine, and depression.[107]   He commented on the syringomyelia diagnosis:  "The patient's main problems are headaches and neck pain with radiation to the left shoulder.  Her exam reveals evidence to indicate brainstem involvement which is likely associated with a syrinx."[108]   He ordered an MRI and an MRA to explore this suspicion and to determine whether the vertebral arteries were compromised.[109]   He

---

[102]   See id.

[103]   See id.

[104]   See id.

[105]   See id.

[106]   See id.

[107]   See Tr. 442-43.

[108]   Tr. 443.

[109]   See id.

increased the Gabapentin and Propranolol dosages and considered increasing the Cymbalta dosage pending a discussion with Plaintiff's psychiatrist.[110]  Dr. Alpert sent a letter to Dr. Flores at MHMRA describing his findings, impressions, and plan and posing the question whether the Cymbalta dosage should be increased.[111]

On April 17, 2014, Plaintiff underwent an MRA of the brain, which revealed "[s]ome vascular variants" in the portion of the circulatory system that provides blood to the brain, and an MRA of the neck, which revealed "[m]ild irregular artherosclerotic plaquing in the left carotid bulb region" but no significant stenosis in the vertebral artery.[112]  An MRI of the brain completed on the same day revealed, in addition to surgical changes from the craniectomy, a partially visualized cervical cord syrinx of no more than three millimeters.[113]

In a medication maintenance note dated May 2, 2014, Dr. Flores recorded that Plaintiff reported sleeping better and denied crying spells, suicidal or homicidal ideation, audio or visual hallucinations, and delusions.[114]  He noted that she was neatly groomed, had a normal gait and station, was cooperative, exhibited

---

[110]    See id.

[111]    See Tr. 440.

[112]    See Tr. 433, 435.

[113]    See Tr. 437.

[114]    See Tr. 540, 541.

normal motor activity, spoke at a normal rate and rhythm with spontaneous language, exhibited logical thought processing and goal-directed associations, and was alert with grossly intact cognition.[115]  Dr. Flores described Plaintiff's mood as dysthymic with blunt affect.[116]

 MRIs of Plaintiff's knees performed on May 16, 2014, revealed meniscus tears in both.[117]

In a medication maintenance note dated June 24, 2014, Dr. Flores recorded that Plaintiff reported sleeping well and denied crying spells, suicidal or homicidal ideation, audio or visual hallucinations, and delusions.[118]  He noted that she was neatly groomed, had a normal gait and station, was cooperative, exhibited normal motor activity, spoke at a normal rate and rhythm with spontaneous language, exhibited logical thought processing and goal-directed associations, and was alert with grossly intact cognition.[119]  Dr. Flores described Plaintiff's mood as euthymic with blunt affect.[120]

As of July 2014, Plaintiff had been treated at St. Luke's emergency room for chest pain multiple times and once for numbness

---

[115]    See Tr. 541.

[116]    See id.

[117]    See Tr. 549-52.

[118]    See Tr. 559, 560.

[119]    See Tr. 560.

[120]    See id.

and pain to left side of her face and neck in the preceding year.[121]
No new diagnosis was found.[122]

In a medication maintenance note dated September 18, 2014,
Reena Andrews, M.D., ("Dr. Andrews") of MHMRA recorded that
Plaintiff reported struggling with disrupted sleep but denied
crying spells, suicidal or homicidal ideation, audio or visual
hallucinations, and delusions.[123]  Dr. Andrews noted that Plaintiff
was neatly groomed, had a normal gait and station, was cooperative,
exhibited normal motor activity, spoke at a normal rate and rhythm
with spontaneous language, exhibited logical thought processing and
goal-directed associations, and was alert with grossly intact
cognition.[124]  Dr. Andrews described Plaintiff's mood as anxious,
noting that she was under financial stress.[125]

Plaintiff was oriented to person, place, time, and situation;
her immediate recall and recent and remote memory were intact; and
her attention span and concentration were good.[126]  The doctor also
found that Plaintiff's fund of knowledge was appropriate for her

---

[121]   See Tr. 600-25.  The frequency with which she sought treatment
spurred this uppercase notation in her chart: "PT HAS HAD 6 CT [computerized
tomography] CHEST PE [pulmonary embolism] PROTOCOL THIS YEAR, ADVISED PT SHE
SHOULD NOT BE GETTING THAT MANY CT OF CHEST, PT STATES SHE WANTS TO MAKE SURE SHE
DOESN'T HAVE A BLOOD CLOT."  Tr. 609.

[122]   See id.

[123]   See Tr. 665, 666.

[124]   See Tr. 541.

[125]   See Tr. 665, 666.

[126]   See Tr. 666.

age and educational level, her intellectual functioning was average, and her insight and judgment were good.[127]

On October 7, 2014, Vasudev B. Shenoy, M.D., ("Dr. Shenoy") of Northwest Cardiology Clinic saw Plaintiff as a new patient for complaints of chest pain, abnormal electrocardiogram ("EKG"), hypertension, claudication[128] pain, palpitation, and dizziness.[129] Dr. Shenoy listed Plaintiff's current medications: (1) Abilify for depression; (2) Cymbalta for depression;(3) Gabapentin for nerve pain; (4) Xarelto for blood clots; (5) Hydrochlorothiazide for hypertension; (6) Propranolol for migraine headaches; (7) Temazepam (commonly known as brand name Restoril) for insomnia.[130]

Dr. Shenoy ordered a twenty-four-hour holter monitor, an arterial doppler of the legs, an echocardiogram, a sleep apnea study, and a myoview stress test.[131] On review of systems, Plaintiff reported difficulty with mobility, increased fatigue, weight gain, frequent headaches, palpitations or irregular heart rate, chest pain, chest tightness, leg swelling, shortness of breath, dizziness and lightheadedness, left-side paresthesia, leg

---

[127]   See Tr. 667.

[128]   Claudication is "a weakness of the legs accompanied by cramplike pains in the calves caused by poor circulation of the blood to the leg muscles." Mosby's Pocket Dictionary of Med., Nursing, & Allied Health 196 (1st ed. 1990).

[129]   See Tr. 648-50.

[130]   See Tr. 648.

[131]   See Tr. 649.

pain, and joint pain.[132]   Other than diminished bilateral pedal pulses, Dr. Shenoy found Plaintiff's physical examination to be normal.[133]

Dr. Shenoy listed as diagnoses: chest pain, abnormal EKG, hypertension, vascular claudication, anticoagulated by anticoagulation treatment, status post craniotomy, Chiari malformation, overweight, obstructive sleep apnea, osteoarthritis in both knees, and palpitations.[134] The doctor instructed Plaintiff to follow up in two weeks and encouraged her to increase her physical activity on a daily basis as tolerated, and advised her to eat a low sodium, low fat diet.[135]

On December 2, 2014, Dr. Udden saw Plaintiff for continuing treatment, and the results of Dr. Udden's review of symptoms and physical examination did not differ from prior appointments.[136] Dr. Udden noted that Plaintiff would see the neurologist again and that she and the neurologist were considering Botox for the torticollis.[137]

On December 3, 2014, Plaintiff returned to Dr. Shenoy for

---

[132]    See id.

[133]    See id.

[134]    See id.

[135]    See Tr. 649-50.

[136]    See Tr. 404-07.

[137]    See Tr. 627-31.

continuing treatment.[138]   Plaintiff remained on the same seven medications as she had been taking six weeks earlier.[139] Plaintiff's report on review of systems remained consistent with the last visit, as did Dr. Shenoy's findings on examination.[140] Dr. Shenoy noted an abnormal nuclear stress test, as well as the diagnoses from the prior visit.[141]   In addition to repeating his recommendations that Plaintiff increase physical activity on a daily basis and eat a low sodium diet, Dr. Shenoy discontinued Propranolol and prescribed aspirin for blood clots, Imdur (generically known as Isosorbide Mononitrate) for chest pain, and Toprol (generically known as Metoprolol Succinate) for migraine headaches.[142]

In a medication maintenance note dated December 11, 2014, Dr. Andrews wrote that Plaintiff reported that her sleep had not improved and she had little energy and motivation but denied that she experienced crying spells, suicidal or homicidal ideation, audio or visual hallucinations, and delusions.[143] Dr. Andrews noted that Plaintiff was neatly groomed, had a normal gait and station, was cooperative, exhibited normal motor activity, was soft spoken

---

[138]   See Tr. 640-42.

[139]   Compare Tr. 640 with Tr. 648.

[140]   Compare Tr. 641 with Tr. 649.

[141]   See Tr. 641.

[142]   See Tr. 641-42.

[143]   See Tr. 655, 656.

with spontaneous language, exhibited logical thought processing and goal-directed associations, and was alert with grossly intact cognition.[144]  Dr. Andrews described Plaintiff's mood as depressed with constricted affect, noting Plaintiff was under financial stress.[145]

Plaintiff was oriented to person, place, time, and situation; her immediate recall and recent and remote memory were intact; and her attention span and concentration were good.[146]  The doctor also found that Plaintiff's fund of knowledge was appropriate for her age and educational level, her intellectual functioning was average, and her insight and judgment were fair.[147]

## B.  Application to Social Security Administration

Plaintiff previously filed applications for disability insurance benefits and supplemental security income in September 2011 that were ultimately denied when the Appeals Council denied her request for review.[148]  Plaintiff reapplied for disability insurance benefits on April 8, 2014,[149] and supplemental security income on May 23, 2014, claiming an inability to work since March

---

[144]   See Tr. 656.

[145]   See Tr. 655, 656.

[146]   See Tr. 656-57.

[147]   See Tr. 657.

[148]   See Tr. 91, 278.

[149]   Elsewhere in the records, the Title II file date is listed as April 4, 2014.  See Tr. 136.

20, 2013, the day after the ALJ in her prior proceeding issued an unfavorable decision.[150]   In the current application, Plaintiff listed the following conditions as limiting her ability to work: Chiari malformation, depression, blood clots, chronic migraine headaches, poor balance, blurred vision, memory loss, left arm and leg numbness, poor concentration, and trouble sleeping.[151]

In a function report completed in April 2014, Plaintiff stated, "I am constantly in pain with my headaches or shoulder/neck pain.  I have poor con[c]entration, poor balance.  I suffer from depression which has me crying a[ ]lot and also having suicidal thoughts to hurt myself most of the time.  I need help remembering to take medications[.]"[152]   Plaintiff listed taking medications, sleeping, and watching television as her only daily activities.[153] She said that her grandmother financially and physically supported Plaintiff's daughter.[154]

Plaintiff also reported that she needed help dressing because of weakness, that she was unable to reach her back or move too much while bathing because of pain and headaches, that she had difficulty taking care of her hair because of left-sided weakness

---

[150]   See Tr. 136, 137, 148, 160, 251–58.

[151]   See Tr. 136, 281.

[152]   See Tr. 293.

[153]   See Tr. 294.

[154]   See id.

26

and neck pain, and that she relied on a cane for balance to get to and from the bathroom.[155]   Plaintiff said that her grandmother helped Plaintiff with baths, reminded her of doctor appointments, and dispensed her medication.[156]

Plaintiff stated that she was unable to prepare her own meals because of double vision, memory loss, weakness in her left arm and leg, headaches, and pain.[157]  She was unable, she said, to perform any house or yard work because of poor balance, memory loss, and pain.[158]  Plaintiff indicated that she did not leave home except for doctor appointments.[159]  Headaches, double vision, memory loss, poor balance, and depression disallowed her leaving her home alone, she explained, and memory loss, double vision, numbness, and pain prevented her from driving.[160]   Regarding shopping, she reported that her grandmother took care of that as well.[161]   Plaintiff claimed that she was unable to pay bills, count change, handle a savings account, or use a checkbook or money orders because of double vision, poor concentration, and memory loss.[162]

---

[155]   See id.

[156]   See Tr. 295.

[157]   See id.

[158]   See Tr. 295-96.

[159]   See Tr. 296, 297.

[160]   See Tr. 296.

[161]   See id.

[162]   See id.

Plaintiff reported no hobbies, interests, or social activities.[163] She said that her medical condition and depression interfered with her ability to get along with family, friends, and others.[164] On the question of what abilities were affected by her condition, Plaintiff left no box unchecked, indicating that lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, remembering, completing tasks, concentrating, understanding, following instructions, using hands, and getting along with others were all affected.[165] In addition to other impairments previously mentioned, Plaintiff said that her left vocal cord was paralyzed, which made talking difficult.[166] Plaintiff said she could walk for fifteen to twenty minutes at which point she would have to stop to take medication and wait for the pain to subside.[167]

Plaintiff reported that she did not follow written or spoken instructions well and did not handle stress or changes in routine well.[168] She also reported entertaining thoughts of hurting herself with increasing frequency, crying often, and having no appetite.[169]

---

[163]   See Tr. 297.

[164]   See Tr. 298.

[165]   See id.

[166]   See id.

[167]   See id.

[168]   See Tr. 298, 299.

[169]   See Tr. 299.

Plaintiff said she experienced side effects from her medication, including drowsiness, diarrhea, vomiting, dizziness, blurred vision, and shortness of breath.[170]

On May 13, 2014, Caren Phelan, Ph.D., ("Dr. Phelan") reviewed Plaintiff's medical record and completed a Psychiatric Review Technique.[171]   Dr. Phelan opined that migraines and affective disorder were severe impairments.[172]   She assessed whether Plaintiff's psychiatric disposition met or equaled any of the disorders described in the listings of the regulations[173] (the "Listings"), specifically considering Listing 11.18 (Cerebral Trauma) and Listing 12.04 (Affective Disorders).[174]   Dr. Phelan assessed Plaintiff's restriction of activities of daily living ("ADLs") as moderate and Plaintiff's difficulties in maintaining social functioning and maintaining concentration, persistence or pace as mild.[175]  Dr. Phelan found no evidence of repeated episodes of decompensation, each of extended duration, and insufficient evidence to establish the presence of paragraph "C" criteria.[176] Finding that Plaintiff's impairments did not meet or equal the

---

[170]   See Tr. 300.

[171]   See Tr. 139-40.

[172]   See Tr. 139.

[173]   20 C.F.R. Pt. 404, Subpt. P, App. 1.

[174]   See Tr. 139.

[175]   See id.

[176]   See id.

Listings criteria, Dr. Phelan noted that Plaintiff appeared to be stable on medication as evidenced by the notes of an examination on May 2, 2014, her first in six months.[177]

On a Mental RFC Assessment, Dr. Phelan evaluated Plaintiff as markedly limited in "[t]he ability to understand and remember detailed instructions" and "[t]he  ability to carry out detailed instructions."[178]  The doctor found Plaintiff moderately limited in the following categories: (1) "[t]he ability to remember locations and work-like procedures;" (2) "[t]he ability to understand and remember very short and simple instructions;" (3) "[t]he ability to carry out detailed instructions; (4) "[t]he ability to maintain attention and concentration for extended periods;" (5) "[t]he ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" (6) "[t]he ability to sustain an ordinary routine without special supervision;" (7) "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" (8) "[t]he ability to interact appropriately with the general public;" (9) "[t]he ability to accept instructions and respond appropriately to criticism from supervisors;" (10) "[t]he ability to get along with coworkers or

---

[177]    See Tr. 140.

[178]    Tr. 142.

peers without distracting them or exhibiting behavioral extremes;"
(11) "[t]he ability to respond appropriately to changes in the work
setting;" (12) "[t]he ability to travel in unfamiliar places or use
public transportation;" (13) "[t]he ability to set realistic goals
or make plans independently of others."[179]

Regarding all of the other abilities considered under the
broad categories of understanding and memory, sustained
concentration and persistence, social interaction, and adaptation,
Dr. Phelan rated Plaintiff as not significantly limited.[180]  She
concluded that Plaintiff could "perform simple work only, make
simple decisions, get along with co-workers and supervisors and
adapt to changes in the work environment."[181]  Dr. Phelan did not
find Plaintiff's alleged limitations fully supported by the
record.[182]

On May 14, 2014, Scott Spoor, M.D., ("Dr. Spoor") reviewed
Plaintiff's medical record and completed a Physical RFC
Assessment.[183]  Dr. Spoor found that Plaintiff's medically
determinable impairments could reasonably be expected to produce
her pain and other symptoms and that her "statements about the

---

[179]   Tr. 142-43.

[180]   See id.

[181]   Tr. 143.

[182]   See id.

[183]   See Tr. 140-41.

intensity, persistence, and functionally limiting effects of the symptoms [were] substantiated by the objective medical evidence alone" but that her claims of "symptom-related functional limitations and restrictions [could not] be accepted as consistent with the objective medical evidence and other evidence in the case record.[184]   Regarding Plaintiff's physical abilities, Dr. Spoor found that Plaintiff was capable of occasionally lifting or carrying up to twenty pounds, frequently lifting or carrying ten pounds, standing and/or walking for a total of about six hours in an eight-hour workday, sitting for a total of about six hours in an eight-hour workday, and was not limited in her ability to push and/or pull.[185]

According to Dr. Spoor, the record did not establish any postural, manipulative, visual, communicative, or environmental limitations.[186]   Dr. Spoor noted that Plaintiff underwent a suboccipital craniectomy that "was not helpful in alleviating symptoms[] of left[-]sided neck and shoulder pain, impaired balance and both weakness and numbness of the left side."

Based on the agency consultant's opinions, a vocational reviewer found Plaintiff capable of her past relevant work of

---

[184]   Tr. 140, 141.

[185]   See Tr. 141.

[186]   See id.

security guard and driver as performed in the national economy.[187]

On June 18, 2014, Plaintiff completed another function report.[188]  In addition to the symptoms described in her prior report, Plaintiff stated that she had a torn meniscus in each knee.[189]  She said that her grandmother provided for Plaintiff's daughter and transported her to and from school and that Plaintiff's grandmother or daughter assisted Plaintiff with personal care as well remembering to attend to her hygiene and to take her medication.[190]  The majority of the remainder of the report repeated the limitations explained in April 2014 except that Plaintiff's ability to walk reportedly decreased by ten minutes to five to ten minutes.[191]

On reconsideration, Matthew Snapp, Ph.D., ("Dr. Snapp") reviewed Plaintiff's medical record and completed a Psychiatric Review Technique on July 17, 2014.[192]  Dr. Snapp opined that muscle, ligament, and fascia disorder and affective disorder were severe impairments.[193]  Dr. Snapp considered whether Plaintiff's condition

---

[187]    See Tr. 144.

[188]    See Tr. 336-43.

[189]    See Tr. 337.

[190]    See Tr. 337-38.

[191]    See Tr. 338-43.

[192]    See Tr. 151-52.  The reconsideration explanation for Plaintiff's Title XVI application also included Dr. Snapp's assessment.  See Tr. 163-64, 166-68.

[193]    See Tr. 151.

met or equaled Listing 1.03 (Reconstructive Surgery of Weight Bearing Joint) and Listing 12.04 (Affective Disorders) and found that it did not.[194]   Dr. Snapp explained that Plaintiff had a "[history] of unsuccessful craniectomy for Chiari malformation in that it did not relieve [symptoms]."[195]   He noted that Plaintiff "sparingly" attended MHMRA, experienced poor concentration and forgetfulness, and exhibited limitations in ADLs and social functioning.[196]   However, he did not find that the degree of Plaintiff's symptoms would "significantly/consistently" compromise work-related "abilities/activities."[197]

On a Mental RFC Assessment, Dr. Snapp agreed with Dr. Phelan that Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions but found Plaintiff to be less limited in the broad categories of understanding and memory, sustained concentration and persistence, social interaction, and adaptation than Dr. Phelan had found.[198]   Notably, Dr. Snapp found that Plaintiff was not significantly limited in the following work activities in which Dr. Phelan had assessed her as moderately limited: (1) "[t]he ability to remember locations and

---

[194]    See Tr. 151-52.

[195]    Tr. 152.

[196]    See id.

[197]    Id.

[198]    Compare Tr. 142-43 with Tr. 155-56.

work-like procedures;" (2) "[t]he ability to understand and remember very short and simple instructions;" (3) "[t]he ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" (4) "[t]he ability to sustain an ordinary routine without special supervision;" (5) "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" (6) "[t]he ability to accept instructions and respond appropriately to criticism from supervisors;" (7) "[t]he ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;" (8) "[t]he ability to travel in unfamiliar places or use public transportation;" and (9) "[t]he ability to set realistic goals or make plans independently of others."[199]

He added that Plaintiff's allegations were not consistent with the record and that she could "understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors[,] and respond appropriately to changes in the routine work setting."[200]

Laurence Ligon, M.D., ("Dr. Ligon") completed a Physical RFC

---

[199]   Compare Tr. 142-43 with Tr. 155-56.

[200]   Tr. 156.

Assessment on reconsideration and concurred with the findings of Dr. Spoor with three exceptions.[201]  Dr. Ligon answered no to the question whether Plaintiff's "statements about the intensity, persistence, and functionally limiting effects of the symptoms [were] substantiated by the objective medical evidence alone," finding her only partially credible.[202]  The second difference of opinion with Dr. Spoor regarded limits on standing/walking.[203]  Dr. Ligon found Plaintiff could stand/walk for a total of two hours whereas Dr. Spoor had found she could stand/walk for six hours in an eight-hour day.[204]  The third difference regarded postural limitations, where Dr. Ligon opined that Plaintiff could only occasionally climb ramps/stairs, balance, stoop, kneel, and crouch and never climb ladders/ropes/scaffolds or crawl and Dr. Spoor found no postural limitations.[205]  Dr. Ligon referred to the craniectomy as unsuccessful because it did not relieve Plaintiff's symptoms, but he concluded that her alleged limitations were not entirely supported by the record.[206]  Based on the agency consultant's opinions, a vocational reviewer found Plaintiff

---

[201]  Compare Tr. 140-41 with Tr. 152-54.  The reconsideration explanation for Plaintiff's Title XVI application also included Dr. Ligon's assessment.  See Tr. 164-66.

[202]  Tr. 152.

[203]  Compare Tr. 141 with Tr. 152.

[204]  Compare Tr. 141 with Tr. 152.

[205]  Compare Tr. 141 with Tr. 153-54.

[206]  See Tr. 154.

capable of performing her past relevant work as a security guard as actually performed by Plaintiff.[207]

On January 7, 2015, Dr. Alpert completed a Physical Residual Functional Capacity Questionnaire. As prognosis, Dr. Alpert opined that Plaintiff was "poor for improvement but stable."[208] Based on the treatment notes from Plaintiff's appointments in February and March 2014, Dr. Alpert listed Plaintiff's diagnoses, symptoms, and descriptions of pain.[209] He stated, relying on Plaintiff's self reports when he saw her, that Plaintiff's neck and shoulder caused constant aching pain and that she experienced severe migraine headaches four times per week.[210]

When asked to identify the clinical findings and objective signs, Dr. Alpert listed: "nystagmus—severe, hoarse voice, weakness of left hand with poor coordination, left finger[-]to[-]nose ataxia, wide-based gait, poor tandem gait[,] muscle spasm[s] left trapezius muscles."[211] Dr. Alpert opined that the impairments lasted or could be expected to last at least twelve months, but that Plaintiff was not a malingerer and that emotional factors did not contribute to the severity of her symptoms or her functional

---

[207]   See Tr. 157.

[208]   Tr. 782.

[209]   See Tr. 442-44, 448-50, 782.

[210]   See Tr. 782.

[211]   See id.

limitations.[212]   On the immediately subsequent question, however, Dr. Alpert identified depression as a psychological condition that affected her physical condition.[213]

Dr. Alpert estimated that Plaintiff would constantly experience "pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks" due to "residual neurologic deficit after brain surgery."[214] In Dr. Alpert's opinion, Plaintiff was not capable of tolerating even a low level of work stress.[215] Dr. Alpert declined to complete the function-by-function analysis because he had not seen Plaintiff in ten months and could not answer the questions about her work RFC.[216]

Defendant denied Plaintiff's applications at the initial and reconsideration levels.[217]  Plaintiff requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[218]   The ALJ granted Plaintiff's request and conducted a hearing on January 7, 2015.[219]

---

[212]    See id.

[213]    See Tr. 783.

[214]    Id.

[215]    See id.

[216]    See id.

[217]    See 136-84.

[218]    See Tr. 185-86.

[219]    See Tr. 89-135, 187-89, 205-10.

## C.  Hearing

At the hearing, Plaintiff and a vocational expert, Cheryl L. Swisher, J.D., C.R.C., M.A., ("Swisher"), testified, and Plaintiff's grandmother observed.[220]  Plaintiff was represented by an attorney.[221]

The ALJ began by reviewing Plaintiff's past relevant work.[222] The jobs discussed were security guard, which Swisher classified as semi-skilled and performed by Plaintiff in one position at the light exertional level and in another at the sedentary exertional level, and water truck driver, which Swisher classified as semi-skilled and performed by Plaintiff at the light exertional level.[223] The ALJ moved to Plaintiff's personal data and education.[224] Plaintiff said that she could perform only basic arithmetic despite having earned a high school diploma.[225]  She reported no problems with reading and writing.[226]  Plaintiff said that she had not consumed alcohol in more than two years and did not use any illicit drugs.[227]

---

[220]    See Tr. 89-135, 243.

[221]    See Tr. 89.

[222]    See Tr. 94-98.

[223]    See Tr. 97.

[224]    See Tr. 98.

[225]    See id.

[226]    See Tr. 98-99.

[227]    See Tr. 100.

Plaintiff pointed to migraine headaches, which she said she experienced every other day for two days at a time, as the primary reason she was unable to work.[228]   When experiencing a headache, Plaintiff said, she would take prescription medication and would lie down in a dark room.[229]   The ALJ asked Plaintiff about chest pain, and she said that her cardiologist had informed her on the day before the hearing that he suspected a blockage was in her heart and found she had poor circulation around her heart.[230]   The ALJ inquired about each of Plaintiff's medications.[231]   They discussed Abilify, Cymbalta, Gabapentin, Tramadol, Xarelto, Hydrochlorothiazide, Propranolol, Temazepam, aspirin, and Toprol.[232]   Plaintiff stated that she suffered from no side effects of her medications but, later, indicated that her medications caused fatigue and sleepiness.[233]   The ALJ briefly asked about Plaintiff's mental health treatment, to which Plaintiff responded that she had received treatment for depression at MHMRA for about four years.[234]

The ALJ turned the questioning over to Plaintiff's attorney,

---

[228]    See Tr. 100-01.

[229]    See Tr. 101.

[230]    See Tr. 101-02.

[231]    See Tr. 101-04.

[232]    See id.  The ALJ also mention Metoprolol, which is a generic name for Toprol, and Restoril, which is a brand name for Temazepam.  See id.

[233]    See Tr. 104, 126.

[234]    See id.

who asked when Plaintiff's symptoms first manifested.[235]  Plaintiff responded that they began in 2010 when she was working as a security guard.[236]  She said she was not able to perform her job because she developed problems with walking, balancing, and concentrating and she missed a lot of work due to headaches.[237] Plaintiff said she left that field of work and worked at a donations call center for a month or two before the headaches interfered with the performance of that job.[238]  Then, Plaintiff worked for a few months at Federal Express as a package scanner.[239]

Plaintiff reported that she began treatment for the headaches and other symptoms in 2011.[240]  At that time, she said, she was diagnosed with Chiari malformation.[241]  Plaintiff said that, later that year, she underwent brain surgery, which was performed by Edward Duckworth, M.D., ("Dr. Duckworth").[242]  She testified that the doctor told her that Chiari malformation would cause slurred speech and imbalance and referred her to speech therapy and

---

[235]     See Tr. 105.

[236]     See id.

[237]     See Tr. 105, 106.

[238]     See Tr. 107.

[239]     See id.

[240]     See Tr. 107, 109.

[241]     See Tr. 108.

[242]     See Tr. 109.

41

physical therapy.[243]   Although she attended both and they helped,
she said that she continued to have problems with speaking,
balance, and left-sided weakness.[244]   She said that Dr. Duckworth
explained that the left side of her body would never return to
normal and would eventually become dead weight and that the
paralysis of the vocal cord, the issues with her left eye, the
weakness on the left side of her body, and possibly the heart
blockage were all connected to the Chiari malformation.[245]

Plaintiff's attorney asked her about the three
hospitalizations in early 2013, and she described her initial
complaints and the course of each hospitalization.[246]   She said that
she underwent a lymph-node biopsy while hospitalized in January
2013, that she was diagnosed with torticollis and blood clots while
hospitalized in February 2013, and that she was diagnosed with
blood clots in the muscle behind her stomach while hospitalized in
March 2013.[247]

As current symptoms of Chiari malformation, Plaintiff said
that she experienced swelling and nerve pain in her neck that
caused headaches, swelling, and pain in her left shoulder.[248]   She

---

[243]    See Tr. 110.

[244]    See Tr. 111, 113.

[245]    See Tr. 114.

[246]    See Tr. 115-20.

[247]    See id.

[248]    See Tr. 117.

also explained that she could not raise her left arm above the shoulder level due to pain.[249]  Plaintiff addressed the more recent diagnosis of bilateral meniscal tears requiring surgery.[250] Although the pain prevented her from standing for more than five or ten minutes, Plaintiff said that she put off surgery because "so much was going on with [her], and [she] just said [she] would wait for it."[251]

Plaintiff also discussed her symptoms related to depression, stating that she cried three to four times a day, experienced auditory and visual hallucinations.[252]  She said that, after her brain surgery, she noticed decreases in her abilities to think and concentrate and an increase in mood swings.[253]

Plaintiff described her daily activities as lying down three to four times a day amounting to about six hours between 8:00 a.m. and 5:00 p.m.[254]  She said that she routinely retired to bed about 8:30 p.m. but was not able to sleep through the night either because of a headache or insomnia.[255]  Plaintiff reported getting

---

[249]    See Tr. 118.

[250]    See tr. 124.

[251]    Tr. 125.

[252]    See Tr. 123.

[253]    See id.

[254]    See Tr. 125-26.

[255]    See Tr. 125.

only two to three hours of sleep per night.[256]

At the conclusion of Plaintiff's testimony, Swisher took the stand to discuss the capability of an individual with Plaintiff's age, education, work history, and limitations to perform Plaintiff's prior work or other jobs.[257]   The ALJ presented the following hypothetical individual:

> Assume a person limited to sitting six hours; standing and walking no more than two hours; lifting and carrying no more than ten pounds occasionally and frequently [sic].   There would be occasional climbing but no climbing ladders, ropes or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; frequent reaching, handling, and fingering with the left upper extremity.
> There would be the need for an assistive device to ambulate.   The person is further limited to simple work; occasional interaction with the public; and she's able to do jobs with occasional changes in work procedures and requirements.[258]

Swisher stated that such an individual could not perform any of Plaintiff's prior relevant work but would be able to perform work as a sorter, an eyeglass polisher, and a surveillance system monitor, all of which were categorized as unskilled, sedentary positions.[259]   Plaintiff's attorney added to the hypothetical individual an inability to use the left arm on a frequent basis

---

[256]   See id.

[257]   See Tr. 130-33.

[258]   Tr. 130.

[259]   See Tr. 130-31.

because of pain, and Swisher identified only one job possibility.[260]
The attorney then added:

> Now assume with me that you have a hypothetical
> individual who is reduced to the sedentary level, meaning
> can lift up to ten pounds; however, cannot raise either
> arm above shoulder level.  And with the left arm, can
> only lift up to two to three pounds, but with the right
> arm can lift up to ten pounds.  Assume further, the
> hypothetical individual would need a cane to ambulate,
> and the cane would be in the nondominant hand, which
> would be the left hand.  But assume that the cane is used
> for balance.
> Further assume that the hypothetical individual had
> headaches that would require the claimant to be absent
> from work one day a week.  Would there be any jobs in the
> national economy that such an individual could perform
> eight hours a day, five days a week, 52 weeks a year, on
> a sustained basis?

Swisher answered in the negative.  Plaintiff's attorney offered a

second set of limitations to add to the ALJ's original hypothetical

individual that were related to the bilateral meniscal tears: "no

climbing, no crawling, no crouching, no bending, no stooping, and

could only stand at the minimum [sic] of five to ten minutes, but

would need to sit down after that for at least 15 to 20 minutes."[261]

Again, Swisher opined that no jobs would be available.[262]

## D.  **Commissioner's Decision**

On February 9, 2015, the ALJ issued an unfavorable decision.[263]

The ALJ found that Plaintiff met the requirements of insured status

---

[260]    See Tr. 132.

[261]    Tr. 133.

[262]    See id.

[263]    See Tr. 12-26.

through December 31, 2015, and that Plaintiff had not engaged in substantial gainful activity from March 20, 2013, the alleged onset date, through the date of the ALJ decision.[264]

The ALJ recognized the following impairments as severe: "degenerative joint disease in both knees; Chiari malformation status post-surgical correction; history of deep vein thrombosis; alcohol abuse; and an affective disorder."[265]   The ALJ found the following impairments nonsevere: "mild carotid artery plaque, heart issues, hypertension, and vocal cord dysfunction."[266]  He found that blurred vision was not a medically determinable impairment.[267]

The identified severe impairments, individually or collectively, did not meet or medically equal any Listing, according to the ALJ.[268]  In particular, the ALJ considered Listing 1.02 (Major Dysfunction of a Joint(s)), Listing 4.11 (Chronic Venous Insufficiency of a Lower Extremity with Incompetency or Obstruction of the Deep Venous System), Listing 11.00 (Neurological Disorders), Listing 11.17 (Neurodegenerative Disorders of the Central Nervous System), Listing 12.04 (Affective Disorders), and Listing 12.09 (Substance Addiction Disorders).[269]   Regarding the

---

[264]   See Tr. 15, 17.

[265]   Tr. 17.

[266]   Tr. 19.

[267]   See id.

[268]   See id.

[269]   See Tr. 19-21.

four Listings for physical impairments, the ALJ offered one
sentence: "The record does not show the claimant is unable to
ambulate effectively, has disorganization of motor function, or has
skin problems or extensive edema due to deep vein thrombosis."[270]
Regarding the Listings for mental disorders, the ALJ discussed
evidence and testimony and concluded that Plaintiff experienced
mild restrictions in the performance of ADLs, mild difficulties in
social functioning, moderate difficulties in concentration,
persistence or pace, and no episodes of decompensation of extended
duration and, therefore, did not meet the criteria of paragraph B
of either Listing considered.[271]  The ALJ also found that paragraph
C of either Listing was not met.[272]

The ALJ concluded that Plaintiff was capable of lifting or
carrying twenty pounds occasionally and ten pounds frequently;
standing or walking two hours in an eight-hour workday with normal
breaks and with the assistance of a device to ambulate; sitting six
hours in an eight-hour workday with normal breaks; and pushing or
pulling twenty pounds occasionally and ten pounds frequently.[273]  As
other limitations, the ALJ found that Plaintiff could not climb
ropes, ladders, or scaffolding; could only occasionally climb ramps

---

[270]    Tr. 19.

[271]    See Tr. 19-20.

[272]    See Tr. 20.

[273]    Tr. 21.

or stairs, balance, stoop, kneel, crouch, or crawl; could frequently but not constantly reach, perform gross handling and fine fingering with the left upper extremity, and could understand, remember, and carry out only "simple 1-2-3 step jobs with infrequent changes to work procedures and requirements and only occasional interaction with the public."[274]

Although the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ did not find Plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of the[] symptoms [to be] entirely credible for the reasons explained in th[e] decision."[275] The ALJ discussed Plaintiff's medical treatment from January 2013 to January 2015 with a few references to earlier treatment.[276]

The ALJ gave little weight to Dr. Alpert's opinion that Plaintiff was incapable of even low stress jobs because Dr. Alpert "was unable to provide a function-by-function analysis to support his conclusions" on account of not having seen Plaintiff in ten months and because Dr. Alpert based his opinion on an inability to tolerate stress even though he was not a mental health professional, and because Dr. Alpert only examined Plaintiff a

---

[274]   Id.

[275]   Tr. 22.

[276]   Tr. 22-24.

"couple of times."[277]   On the other hand, the ALJ gave the state agency consultants great weight because those opinions were consistent with the record evidence as a whole.[278]

The ALJ found Plaintiff unable to perform her past relevant work of airport truck driver and security guard.[279]   The ALJ noted that, as a younger individual with a high school education and the ability to communicate in English, transferability of job skills was not material under the Medical-Vocational Guidelines[280] ("the Grid"), which directed a finding of "not disabled" if Plaintiff were capable of a full range of a light work.[281]   However, the ALJ's RFC assessment found that Plaintiff's ability to perform a full range of light work was impeded by additional limitations; thus, the ALJ explained, he relied on the testimony of Swisher to determine whether Plaintiff could perform other work.[282]

Based on Swisher's response to the ALJ's hypothetical question asking whether a person with Plaintiff's age, education, work experience, and RFC could perform jobs available in the state and national economy, the ALJ stated that he found Plaintiff capable of performing the requirements of the sedentary, unskilled occupations

---

[277]   Tr. 24.

[278]   See id.

[279]   See id.

[280]   20 C.F.R. Pt. 404, Subpt. P, App. 2.

[281]   See Tr. 25.

[282]   See id.

of a sorter, an eyeglass polisher, and a surveillance camera operator.[283]   The ALJ noted that he took into consideration the erosion of the unskilled, light job base caused by Plaintiff's inability to stand or walk for more than two hours per workday.[284] The ALJ found that Plaintiff had not been under a disability from March 20, 2013, through February 9, 2015, the date of the ALJ's decision.[285]

Plaintiff appealed the ALJ's decision, and, on May 22, 2015, the Appeals Council denied Plaintiff's request for review.[286]   The Appeals Council acknowledged Plaintiff's education records dated September 9, 1997, to May 26, 1998, as additional evidence made part of the record.[287]   The Appeals Council's decision transformed the ALJ's decision into the final decision of the Commissioner. After receiving the Appeals Council's denial, Plaintiff sought judicial review of the decision by this court.[288]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating

---

[283]    See id.

[284]    See id.

[285]    See Tr. 26.

[286]    See Tr. 1-4, 10-11.

[287]    See Tr. 13.

[288]    See Doc. 1, Pl.'s Orig. Compl.

the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has

> done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. §§ 404.1520, 416.920.   The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled.   Greenspan, 38 F.3d at 236.

## B.   **Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).   It is "something more than a scintilla but less than a preponderance."   Id.   The Commissioner has the responsibility of deciding any conflict in the evidence. Id.   If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.   42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.   Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).   In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the

Commissioner's judgment.  <u>Brown v. Apfel</u>, 192 F.3d 492, 496 (5th Cir. 1999).  In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.  <u>Id.</u>

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  Plaintiff asserts that the ALJ's decision contains the following errors: (1) failure to accord proper weight to Drs. Alpert and Udden's opinions; (2) failure to properly evaluate Plaintiff's credibility; (3) failure to properly evaluate Listing 11.19; and (4) failure to properly evaluate Plaintiff's RFC.  Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

**A.**  **Failure to Accord Proper Weight to Drs. Alpert and Udden's Opinions**

The ALJ must evaluate every medical opinion in the record and decide what weight to give each.  <u>See</u> 20 C.F.R. §§ 404.1527(c), 416.927(c).  The ALJ is required to give good reasons for the weight given a treating source's opinion.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2);  SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

> When the determination or decision . . . is a denial[,] . . . the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight. SSR 96-2p, 1996 WL 374188, at *5.

The regulations require that, when a treating source's opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight.   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000); SSR 96-2p, 1996 WL 374188, at *1.

When the ALJ does not give a treating physician's opinion controlling weight, he must apply the following nonexclusive factors to determine the weight to give the opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the relevant medical evidence supporting the opinion; (4) the consistency of the opinion with the remainder of the medical record; and (5) the treating physician's area of specialization.   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Newton, 209 F.3d at 456.   However, the ALJ is only required to consider these factors in deciding what weight to give a medical source opinion; he is not required to record in writing every step of the process.   See 20 C.F.R. §§ 404.1527(c), 416.927(c) ("Unless we give a treating source's opinion controlling weight . . . we

54

*consider* all of the following factors in deciding the weight we give to any medical opinion.")(emphasis added).

Even though the medical opinion and diagnosis of a treating physician should be afforded considerable weight, "the ALJ has sole responsibility for determining a claimant's disability status." <u>Martinez v. Chater</u>, 64 F.3d 172, 176 (5th Cir. 1995)(quoting <u>Moore v. Sullivan</u>, 919 F.2d 901, 905 (5th Cir. 1990)). A medical source's statement that the claimant is "disabled" or "unable to work" does not mean the Commissioner will determine the claimant is, in fact, disabled. <u>Spellman v. Shalala</u>, 1 F.3d 357, 364 (5th Cir. 1993)(quoting 20 C.F.R. § 404.1527(e)(1)[289]); <u>see also</u> 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). The determination of disability is not a medical opinion entitled to deference, but a legal conclusion within the Commissioner's scope of authority. <u>Frank v. Barnhart</u>, 326 F.3d 618, 620 (5th Cir. 2003).

The ALJ is not "required to address every piece of evidence" in the process. <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000); <u>see also</u> <u>Audler v. Astrue</u>, 501 F.3d 446, 448 (5th Cir. 2007)(stating that "the ALJ is not always required to do an exhaustive point-by-point discussion" but must offer support for his conclusions so that a reviewing court can determine whether the decision is based on substantial evidence)(quoting <u>Cook v. Heckler</u>, 738 F.2d 1168, 1172 (4th Cir. 1986)); <u>Brunson v. Astrue</u>, No. 09-

---

[289]    This provision has been moved to 20 C.F.R. §§ 404.1527(d)(1).

41148, 2010 WL 2802372, at *2 (5th Cir. July 16, 2010)(stating that the ALJ's selection of evidence to discuss does not mean that he did not consider all of the other evidence in the record).

### 1. Dr. Alpert

Plaintiff argues that, in according Dr. Alpert's opinions little weight, the ALJ improperly disregarded Dr. Alpert's Physical RFC Questionnaire, discounted his evaluations, incorrectly stated that he was not a mental health professional, ignored his statement that the surgery was unsuccessful, and failed to find nystagmus a severe impairment.

The ALJ discussed Dr. Alpert's treatment of Plaintiff, which consisted of two appointments.[290]  The ALJ stated that Dr. Alpert found that Plaintiff suffered vocal cord dysfunction, which the ALJ found nonsevere because nothing in the record indicated that Plaintiff's vocal cord dysfunction affected her ability to communicate and he had no trouble understanding her at the hearing.[291]  The ALJ noted that Dr. Alpert found Plaintiff's gait to be slightly unsteady with a slightly wide base and that Dr. Alpert opined that the Chiari malformation was stable and unlikely to improve.[292]

As far as Dr. Alpert's RFC questionnaire, the ALJ discussed it

---

[290]   See Tr. 23.

[291]   See Tr. 19.

[292]   See Tr. 23.

in detail, including Dr. Alpert's notations therein that were drawn directly from the treatment notes of his two appointments with Plaintiff.[293]   The ALJ specifically stated that he considered Dr. Alpert's RFC opinions but gave them little weight because he did not provide a function-by-function analysis.[294]   The ALJ also stated that Dr. Alpert's opinion that Plaintiff could not work due to an inability to tolerate stress, an opinion on a mental limitation, was better left to "more qualified sources of record [who] made different findings in this respect."[295]

As required by the regulations, the ALJ considered Dr. Alpert's treatment notes and evaluated Dr. Alpert's opinion testimony, providing good reasons for giving the latter less than controlling weight.  Because Dr. Alpert's opinion on Plaintiff's inability to tolerate even a low-stress work environment was not well-supported by diagnostic techniques that he employed during her care and was not consistent with the MHMRA records, it was not entitled to controlling weight.[296]   The ALJ did not address in writing each of the factors for the weight determination, but he was not required to do so.

For two appointments over two months in early 2014, Dr. Alpert

---

[293]   See id.

[294]   See Tr. 24.

[295]   Id.

[296]   In the court's opinion, Dr. Alpert's opinion that Plaintiff is incapable of tolerating even low-stress jobs is akin to an opinion that Plaintiff is incapable of work, which is not a medical opinion entitled to deference.

treated Plaintiff's neurological disorders, which he found to be stable. At the first appointment, Dr. Alpert listed Chiari malformation with residual dysfunction, common migraine, torticollis, and depression as Plaintiff's diagnoses. At the second appointment, he listed again listed Chiari malformation, migraine, and depression and added syringomyelia but omitted torticollis. Dr. Alpert adjusted Plaintiff's dosage of Gabapentin (for nerve pain) and added Propranolol (for migraine headaches). He also ordered an MRI and MRA, which led to no additional treatment.

Dr. Alpert diagnosed Plaintiff with nystagmus, commenting that it was unlikely to improve, but initiated no treatment. He recorded blurred vision in his review of systems at the first appointment but not the second; at both appointments, he noted that Plaintiff's visual fields were intact.

Regarding the contention that the ALJ failed to recognize Dr. Alpert as a mental health professional entitled to offer opinions on Plaintiff's mental limitations, whether Dr. Alpert was a board-certified psychiatrist, as Plaintiff asserts, is not relevant. Dr. Alpert clearly was not Plaintiff's psychiatrist; Dr. Flores was. At both appointments with Plaintiff, Dr. Alpert considered increasing the dosage of Cymbalta but deferred to Dr. Flores. After the second appointment, Dr. Alpert sent Dr. Flores a summary, including his recommendation regarding the dosage of Cymbalta. The

ALJ simply gave greater weight to Dr. Flores's many treatment notes over a period of years than to Dr. Alpert's opinion testimony that was proffered ten months after two nonpsychiatric appointments with Plaintiff.

Plaintiff accuses the ALJ of ignoring Dr. Alpert's statement that surgery was unsuccessful.  In fact, Dr. Alpert recorded what Plaintiff shared with him, to wit, that the craniectomy "did not alleviate her symptoms."[297]    Drs. Spoor and Ligon, agency consultants who provided RFC assessments on initial and reconsideration, both also stated that the craniectomy failed to relieve her systems.  It was Dr. Ligon who referred to the surgery as unsuccessful on that basis.  Regardless, the ALJ's failure to refer to the surgery as unsuccessful is not an error because he took into consideration all of the symptoms Plaintiff experienced post surgery during the relevant time period.

Finally, Plaintiff takes issue with the ALJ's decision not to include nystagmus as a severe impairment.  This too is a nonissue for two reasons.  First, when at least one impairment is found severe at step two of the process, the failure to find others is not a reversible error because the ALJ proceeded to the next step of the process and all impairments, even those that were not severe, are to be taken into account in determining a plaintiff's RFC.  See Cagle v. Colvin, Civil Action No. H-12-0296, 2013 WL

---

[297]    See Tr. 448.

2105473, at *5 (S.D. Tex. May 14, 2013)(unpublished)(discussing 20 C.F.R. §§ 404.1545(e), 416.920(a)(4) (ii), 416.945(e)).   Second, the record contains substantial evidence that, despite the diagnosis of nystagmus, Plaintiff experienced no vision limitations.   Dr. Alpert noted Plaintiff's allegation of blurred vision in the notes of the first appointment but not in the second. In both, he indicated that Plaintiff's visual fields were intact. No other treatment provider noted vision problems and neither agency consultant incorporated any vision limitation in Plaintiff's RFC.

The ALJ properly considered and accorded weight to Dr. Alpert's opinion.

## 2.  Dr. Udden

Plaintiff argues that the ALJ gave no weight to Dr. Udden's opinion.

Plaintiff is clearly mistaken in this assertion.   The ALJ discussed Dr. Udden's treatment notes, which covered multiple appointments from his first encounter with her while she was hospitalized in February 2013 through at least December 2014, the date of the last treatment note in the record.[298]   The ALJ acknowledged Dr. Udden's findings, including torticollis, slight weakness in the left arm, and residual muscle enlargement of the

---

[298]   See Tr. 23.

left shoulder.[299]   He also noted that Dr. Udden's findings that Plaintiff was stable, exhibited no new problems, had normal pulses, and was negative for musculoskeletal problems.[300]

As the ALJ articulated Dr. Udden's findings in the written disability decision, he clearly evaluated them and decided what weight to give them.   However, to the extent that Plaintiff is complaining that the ALJ did not articulate the weight to which he gave Dr. Udden's medical opinions, the court agrees that the ALJ failed to do so.   The court finds the error harmless because the ALJ appeared to give Dr. Udden's medical opinions controlling weight.   See Audler, 501 F.3d at 448 (recognizing that, even if an error occurred, "it is harmless as long as 'the substantial rights of a party have not been affected'")(quoting Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988)).

Dr. Udden, a hematologist, primarily monitored Plaintiff's anticoagulation medication.   He examined Plaintiff himself multiple times and, on at least two occasions, served as a teaching physician when Drs. Patel and Imam examined Plaintiff.   Dr. Udden and his students consistently recorded neck stiffness, weakness, and headaches but no visual disturbance, shortness of breath, chest pain, or leg swelling.[301]   Given controlling weight, Dr. Udden's

---

[299]    See id.

[300]    See id.

[301]    See Tr. 373.

findings would not lead to a finding of disability. Plaintiff has failed to explain how the ALJ's conclusion that she was not disabled would have been altered by his discussion of the weight given Dr. Udden's findings.

In a related issue, Plaintiff also expresses concern that the ALJ failed to consider all of the medical evidence. Plaintiff accuses the ALJ of picking and choosing from the medical record and discussing only the "isolated bits of evidence" that support a finding of no disability.[302] The court fundamentally disagrees with Plaintiff on this point, but, regardless, the ALJ provided a sufficient discussion of the medical evidence for the court to determine that it was based on substantial evidence.

The ALJ properly considered and accorded weight to Dr. Udden's opinion.

## B.   <u>Failure to Properly Evaluate Plaintiff's Subjective Symptoms</u>

In March 2016, the Social Security Administration issued a new Social Security Ruling ("SSR") on the evaluation of symptoms in disability claims. <u>See</u> SSR 16-3p, 2016 WL 1119029 (Mar. 24, 2016). SSR 16-3 superseded the longstanding SSR 96-7p, 1996 WL 374186 (July 2, 1996), which was entitled "Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements." The stated purpose of SSR 16-3p is to "provide guidance about how [the

---

[302]    Doc. 24, Pl.'s Mot. for Summ. J. p. 57.

Social Security Administration] evaluate[s] statements regarding the intensity, persistence, and limiting effect of symptoms in disability claims under Titles II and XVI of the SSA." SSR 16-3p, 2016 WL 1119029, at *1. SSR 16-3p eliminated the word "credibility" from the policy. See id.; Mayberry v. Colvin, No. G-15-330, 2016 WL 7686850, at *5 (S.D. Tex. Nov. 28, 2016)(unpublished). District courts are divided on the issue of whether SSR 16-3p should apply retroactively. Mayberry, 2016 WL 7686850, at *5 (collecting cases). In Mayberry, the court pointed out that SSR 16-3p "was designed to clarify rather than change existing law." Id.

SSR 16-3p explains that, pursuant to the regulations, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." SSR 16-3p, 2016 WL 1119029, at *2. Even so, the ALJ cannot ignore statements of symptoms but, rather, must evaluate them according to the two-step process set forth in the regulations: (1) consideration of "whether there is an underlying medically determinable physical or mental impairment[] that could reasonably be expected to produce an individual's symptoms, such as pain;" and (2) evaluation of "the intensity and persistence of the symptoms to determine the extent to which the symptoms limit an [adult's] ability to perform work-related activities. See id. The court must give deference to the ALJ's evaluation of the

plaintiff's subjective complaints if it is supported by substantial record evidence.  See Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990).

Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's credibility because he applied SSR 96-7p, which is no longer in effect.  Plaintiff contends that, although SSR 16-3p had not been issued at the time of the ALJ's decision, it should be applied retroactively to her disability determination and would render a different result.  Following the analysis of Mayberry that the purpose of the new SSR was to clarify not change, the court finds the issue of retroactive applicability to be moot.

Regardless of which SSR applies, the ALJ did not err in his assessment of Plaintiff's subjective complaints.  In fact, the only aspect of the ALJ's decision that ran afoul of SSR 16-3p was the ALJ's use of the words "credible" and "credibility."  As the word "credibility" was allowed at the time the ALJ evaluated Plaintiff's subjective symptoms, the ALJ's use of the word was not a legal error.

Moreover, the ALJ set out the two-step process for evaluating subjective symptoms, which was reaffirmed in SSR 16-3p, and devoted more than a full page to the evaluation.[303]  The ALJ thoroughly discussed Plaintiff's allegations of pain and functional limitations from the hearing testimony and contrasted those

---

[303]   See Tr. 21-23.

64

statements with the medical evidence.[304]   The ALJ concluded that Plaintiff's medically determinable impairments reasonably could be expected to cause the symptoms she alleged but that the intensity, persistence, and limiting effects that she described were not consistent with her course of medical treatment as recorded by her physicians.[305]   For example, he noted that the medical record demonstrated that her symptoms improved with treatment as indicated by her self-reports at appointments as well as by physician observations.[306]   Ultimately, the ALJ found "the evidence [to be] inconsistent with an inability to perform simple work due to mental impairment;" yet, he incorporated limitations attributable to her "chronic pain in combination with her affective disorder, including limited contact with the public."[307]

Plaintiff's allegations of constant pain, poor concentration, and poor balance were supported by the medical evidence and were accounted for in the ALJ's RFC.  Her assertions that she cried frequently, experienced suicidal thoughts, had a poor memory, could not handle stress, could not follow written or spoken instructions well, could not handle her finances, and needed significant help with memory and hygiene care were inconsistent with years of MHMRA

---

[304]   See Tr. 22-23.

[305]   See Tr. 22.

[306]   See id.

[307]   Id.

provider notes.

The ALJ engaged in a proper evaluation of Plaintiff's subjective symptoms and cited substantial evidence from the record in support of his conclusion.

## C.   Failure to Evaluate Listing 11.19

The Listings are divided into sections by body systems, and neurological disorders fall under Listing 11.00. See 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Listing 11.19 (Syringomyelia), which was removed from the Listings effective September 29, 2016,[308] required a diagnosis of syringomyelia with significant bulbar signs or disorganization of motor function as described in Listing 11.04B. Then-current Listing 11.04B stated, "Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)."  Then-current Listing 11.00C stated:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

---

[308]   The Social Security Administration published new Listings for neurological disorders that removed Listing 11.19 for syringomelia.  See DI 27516.010 Disability Determination Services (DDS) Medical Evaluation Criteria to Determine Applicability of Res Judicata, Social Security Administration (Oct. 4, 2016), https://secure.ssa.gov/poms.nsf/lnx/0427516010.

Plaintiff argues that the ALJ failed to evaluate Listing 11.19 for syringomyelia and, thus, the court cannot determine whether the decision is based on substantial evidence. Plaintiff contends "that her diagnosis of syringomyelia and accompanying symptomology meet the criteria under Listing 11.19, specifically, 11.19(B)."[309]

The ALJ stated that he reviewed the medical evidence and considered Listings 1.02, 4.11, 11.00, 11.17, 12.04, and 12.09 but did not mention Listing 11.19.[310] The ALJ did not discuss each of the Listings, opting instead to eliminate all but the Listings for mental disorders[311] with one sentence: "The record does not show the claimant is unable to ambulate effectively, has disorganization of motor function, or has skin problems or extensive edema due to the deep vein thrombosis."[312]

Albeit quite brief, the ALJ's identification of the Listings he considered and the reasons he found none applicable was sufficient. Furthermore, his finding that Plaintiff did not meet Listing 11.00 criterion of disorganization of motor function is

---

[309]     Doc. 24, Pl.'s Mot. for Summ. J. p. 41. Plaintiff's argument focuses on Listing 11.19B; however, she does refer to bulbar signs elsewhere in her brief, where she cited notes from one of Plaintiff's visits to St. Luke's emergency room for chest pains. See id. p. 43. Plaintiff's brief refers to Plaintiff's description of her chest pain as "[b]ulbar signs." Id. The word "bulbar" means "pertaining to the medulla oblongata of the brain and the cranial nerves." Plaintiff's citation to chest pain does not evidence bulbar signs.

[310]     See Tr. 19.

[311]     The ALJ discussed Paragraphs B and C criteria of the Listings for mental disorders in significant detail. See Tr. 19-21.

[312]     Tr. 19.

supported by substantial evidence.  No medical evidence supports a finding that Plaintiff suffered from significant and persistent disorganization of motor function in two extremities.

Dr. Udden repeatedly found that Plaintiff experienced only slight swelling of her left arm and slight weakness in left arm and leg.  Dr. Alpert[313] noted arm and leg weakness, difficulty walking and frequent falling, mild left finger-to-nose ataxia, slightly slower rapid finger tapping on the left, and impaired rapid alternating movements of the left arm.  However, he also found her strength to be normal other than mild weakness of the left hand musculature, her muscular tone to be normal, her gait to be normal but mildly unsteady with a slightly wide base, her balance to be normal, her ability to get up on heels and toes to be normal, and her ability to perform heel-to-knee test to be normal.  Dr. Shenoy recorded a normal physical examination and encouraged Plaintiff to increase her physical activity.  These doctors' usage of the words "normal," "slightly," and "mild" and their lack of any suggestion of significant and persistent disorganization of motor function provides more than substantial evidence that Plaintiff did not meet any Listing for neurological disorders.

The ALJ engaged in a proper evaluation of the Listings and cited substantial evidence from the record in support of his

---

[313]   Dr. Alpert diagnosed Plaintiff with syringomyelia with suspected medulla involvement and ordered tests to confirm the suspicion.  However, his notes reflected no treatment and no limitations connected with the diagnosis.

conclusion.

**D.   Failure to Properly Evaluate Plaintiff's RFC**

A claimant's RFC is her remaining ability to work despite all of the limitations resulting from her impairment. See 20 C.F.R. §§ 404.1545(a); 416.945(a); Villa, 895 F.2d at 1023. In determining the claimant's RFC, the ALJ must consider exertional and nonexertional factors. SSR 96-8p, 1996 WL 374184, at *5. Exertional factors include the ability to perform seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Id.; see also 20 C.F.R. §§ 404.1545(b), 416.945(b). Nonexertional factors include the ability to perform other physical activities in the categories of posture, manipulation, vision, communication, and environment, as well as mental activities, such as understanding and remembering instructions. SSR 96-8p, 1996 WL 374184, at *6; see also 20 C.F.R. §§ 404.1545(c), (d), 416.945(c), (d).

In reaching a decision on RFC, the ALJ is required to perform a function-by-function assessment of "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001)(quoting SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)). The mere mention of a condition in the medical records does not establish a disabling impairment or even a significant impact on that individual's functional capacity. Cf.

Johnson v. Sullivan, 894 F.2d 683, 685 (5th Cir. 1990)(referring to a diagnosis as only part of the evidence that must be considered); see also Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983) (stating that the individual must show she is so functionally impaired by the condition that she is precluded from engaging in any substantial gainful activity).   The regulations provide that, although the opinion of a treating physician regarding a claimant's RFC must be considered, the ultimate responsibility for determining this issue lies with the ALJ.   20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Taylor v. Astrue, 706 F.3d 600, 602-03 (5th Cir. 2012).

Plaintiff argues that the ALJ failed to incorporate into the RFC limitations resulting from Chiari malformation and left-arm impairment.[314]  Her briefing on the issue quotes extensively from the medical records, pointing out references to torticollis, nystagmus, intractable headaches, and psoas muscle hematoma without focus on the resulting limitations that she professes the ALJ excluded.   To a large degree, Plaintiff's arguments overlap with her assertion that the ALJ gave insufficient weight to the opinions of Drs. Alpert and Udden.

In his discussion of Plaintiff's RFC, the ALJ addressed every

---

[314]     Several times in her brief, Plaintiff also accuses the ALJ of playing doctor because, Plaintiff asserts, the ALJ rejected Dr. Alpert's opinion without specifying any reason.  This is simply not accurate.  As discussed in the text of this memorandum, the ALJ discounted Dr. Alpert's opinion for several legitimate reasons.  Furthermore, the ALJ did not try to determine Plaintiff's limitations for himself from the record; he simply incorporated the limitations supported by the record and excluded those that were not.

appointment Plaintiff had with Drs. Alpert and Udden, as well as other medical evidence in the record.[315] The ALJ also discussed Dr. Alpert's RFC questionnaire, discounting it, in part because the doctor failed to provide a function-by-function assessment of Plaintiff's physical limitations.[316]  The portion of the questionnaire that Dr. Alpert completed predominantly consisted of information on medical history, symptoms, medical findings, and treatment, information that was very obviously based on his treatment notes.  In fact, much of the information on the questionnaire was drawn verbatim from the notes.  Dr. Alpert opined that Plaintiff was not capable of tolerating even a low level of work stress, seemingly an opinion based on her mental capacity. Yet, he declined to offer an opinion on the part of the questionnaire related to his treatment role — Plaintiff's resulting physical limitations.

The agency consultants, on the other hand, provided full assessments of the Plaintiff's exertional and nonexertional limitations.  The ALJ gave these opinions great weight due to their consistency with the medical record as a whole.[317]

Drs. Phelan and Snapp, agency consultants who performed the

---

[315]    See Tr. 19, 23-24.

[316]    See Tr. 24.

[317]    The ALJ also discounted the Global Assessment of Functioning ("GAF") scores from 2012 (months prior to Plaintiff's alleged onset date) because the indicated level of functioning did not persist for twelve months but, rather, improved with treatment.

Mental RFC Assessments on the initial and reconsideration reviews, respectively, found Plaintiff markedly limited only in her ability to understand, and remember, and carry out detailed instructions. Dr. Snapp found Plaintiff moderately limited in fewer categories than Dr. Phelan, but both doctors found that Plaintiff's alleged limitations were not fully supported by the record and that she could perform simple work, get along with co-workers and supervisors, and adapt to changes in the environment. Regarding Plaintiff's physical ability, Drs. Spoor and Ligon did not agree entirely on her RFC, but, even by the more conservative estimate of her ability, Plaintiff's RFC reflected an ability to perform a limited range of light work. See 20 C.F.R. §§ 404.1567(b), 416.967(b) (defining light work). Notably, based on the doctors' assessments, the vocational experts who reviewed Plaintiff's file at the initial and reconsideration levels found Plaintiff capable of performing her past relevant work.

The ALJ recognized that Plaintiff was limited by her physical problems but found that they were not disabling. He noted that the treatment records reflected ongoing treatment for chronic but stable conditions. Concluding that Plaintiff was capable of a limited range of light work, the ALJ included multiple postural, manipulative, and mental limitations.

Although Plaintiff suffers from formidable health conditions of which she has presented sufficient evidence, that is not enough

to prove disability.   She has not shown that those conditions or the pain associated with them prevent her from performing substantial gainful work activity entirely.   The physicians' treatment notes are consistent on the stability of her conditions and the mild effects her conditions have on her physical and mental limitations.

The ALJ engaged in a proper evaluation of Plaintiff's RFC and that substantial evidence in the record supports of his conclusion.

## C.  **Disposition**

Finding no legal error in the ALJ's decision and finding that substantial record evidence supports his conclusion that Plaintiff is not disabled, the court must affirm the decision.

## IV.  Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's motion be **GRANTED** and Plaintiff's motion be **DENIED.**

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13.   Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such

objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this <u>15</u><sup>th</sup> day of February, 2017.

_____
U.S. MAGISTRATE JUDGE